UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

_____

RAD SOFTWARE, LLC,

        Plaintiff,

    v.                              Case No. 26-cv-00465

WISCONSIN AMUSEMENT &
MUSIC OPERATORS, INC.,
WISCONSIN P&P AMUSEMENT, INC.
MICHAEL WEIGEL,

        Defendants.

_____

# COMPLAINT

_____

Plaintiff RAD Software LLC ("RAD Software" or "Plaintiff"), by and through its undersigned counsel, as and for its Complaint against Defendants Wisconsin Amusement & Music Operators, Inc. ("WAMO"), Wisconsin P&P Amusement, Inc. ("P&P"), and Michael "Mike" Weigel ("Weigel"), alleges as follows:

**STATEMENT OF THE CASE**

1. This is a federal antitrust action to dismantle a closed-loop combination through which Defendant Wisconsin Amusement & Music Operators, Inc. ("WAMO") — a Wisconsin trade association has, for years, foreclosed competition in the Wisconsin market for skill-game and sweepstakes amusement machines. WAMO's Bylaws restrict membership to a closed circle of legacy route operators and, by design, systematically exclude new entrants to the space. WAMO enhances its exclusionary mechanics by inducing equipment manufacturers such as Banilla Games to refuse sales of equipment to any Wisconsin business that is not a member of

WAMO. WAMO actively verifies membership before equipment ships interstate. The result is a classic group boycott — a concerted refusal to deal that bars non-WAMO entrants such as Plaintiff RAD Software LLC from purchasing the equipment they need to compete, and that enables incumbent WAMO operator-members to extract a fifty-percent (50%) revenue-share royalty from Wisconsin retail venues, two to three times the rate prevailing in competitively structured markets.

2.      Plaintiff brings this action under Section 1 of the Sherman Act, Wis. Stat. § 133.03, and Section 43(a)(1)(B) of the Lanham Act, and seeks principally injunctive and structural relief under Section 16 of the Clayton Act to dissolve the closed loop, restore competitive conditions to the Wisconsin amusement-machine market, and relieve Wisconsin retail venues of the supracompetitive royalty extraction the closed loop sustains.

## INTRODUCTION

3.      This federal antitrust and false-advertising action arises from a long-standing combination among Wisconsin route operators — organized through WAMO, a Wisconsin trade association — to foreclose competition in the supply, placement, and operation of skill-game and sweepstakes amusement machines in Wisconsin retail venues.

4.      WAMO is a combination of horizontal competitors. Its Bylaws condition admission on the maintenance of legacy darts, pool, and jukebox routes, require recommendations from two incumbent operator-members, and vest "absolute discretion" over admission in a Board of Directors composed of ten operator-member competitors out of eleven total directors.

5.      WAMO's membership records function as the gatekeeping credential for access to the dominant skill-game equipment supply in Wisconsin. The dominant manufacturer, Banilla Games, Inc., has agreed with its authorized out-of-state distributors that Banilla equipment will not be sold to any Wisconsin purchaser who is not a current WAMO member. WAMO confirms applicant membership before distributors ship equipment interstate into Wisconsin.

6.      The combined effect is a concerted refusal to deal: a group of horizontal competitors at the route-operator level has barricaded themselves from competition at that level by inducing the dominant equipment supplier to deny supply to would-be entrants. Non-WAMO entrants, including Plaintiff, are foreclosed from purchasing the dominant skill-game equipment, regardless of merit, technological innovation, or competitive offering.

7.      The closed-loop structure has produced a directly observable market distortion: WAMO operator-members charge Wisconsin retail venues a revenue-share royalty of approximately fifty percent (50%) of gross machine revenue, for the life of the placement, while route operators in competitively structured markets charge approximately fifteen percent (15%) to twenty-five percent (25%). The supracompetitive premium is the price Wisconsin retail venues pay because the closed loop leaves them no competitive alternative.

8.      Although damages, which are available, are sought in this action, Plaintiff seeks principally injunctive and structural relief to dissolve the closed-loop combination, to restore competitive conditions to the Wisconsin amusement-machine market, to open the market to non-WAMO entrants such as Plaintiff, and to relieve Wisconsin retail venues of the supracompetitive royalty extraction enabled by the closed-loop structure.

**PARTIES**

9. Plaintiff RAD Software is a limited liability company organized and existing under the laws of the State of Wisconsin, headquartered in Milwaukee, Wisconsin.

10. RAD Software develops and operates a sweepstakes-based gaming platform marketed under the brand name "LuckLake," among others.

11. Defendant Wisconsin Amusement & Music Operators, Inc. ("WAMO") is a Wisconsin nonprofit corporation organized under Chapter 181 of the Wisconsin Statutes, registered federally as a 501(c)(6) tax exempt trade association, with its principal place of business in Madison, Wisconsin.

12. WAMO's membership consists of operators of coin-operated amusement, music, and skill-game machines in Wisconsin.

13. WAMO is the principal Defendant in this action.

14. Defendant Wisconsin P&P Amusement, Inc. ("P&P") is a Wisconsin corporation with its principal place of business at 12565 W. Lisbon Road, Brookfield, Wisconsin 53005.

15. P&P is a coin-operated amusement route operator that places amusement and gaming machines in retail venues in Wisconsin.

16. P&P is a current WAMO operator-member.

17. Defendant Michael "Mike" Weigel ("Weigel") is, on information and belief, a Wisconsin resident.

18.    At all material times Weigel was the President of WAMO and the principal of P&P.

## JURISDICTION AND VENUE

19.    This Court has subject-matter jurisdiction over Count I (Sherman Act § 1) and Count III (Lanham Act § 43(a)(1)(B)) under 28 U.S.C. §§ 1331 and 1337(a), and under 15 U.S.C. §§ 15 and 26 (Clayton Act jurisdiction over private antitrust actions).

20.    This Court has supplemental jurisdiction over Count II (the Wisconsin statutory antitrust claim, pleaded in the alternative to Count I) under 28 U.S.C. § 1367(a).

21.    The Count II state-law antitrust claim arises from the same case or controversy as the federal claims: it turns on the same closed-loop exclusionary structure that constitutes the federal Sherman Act and Lanham Act violations.

22.    The conduct at issue substantially affects interstate commerce.

23.    Banilla Games, Inc. is a North Carolina corporation headquartered in Greenville, North Carolina, that ships skill-game machines across state lines into Wisconsin.

24.    On information and belief, the authorized distributors that enforce the WAMO-membership condition — including PB&J Industries, Inc., among others — are located outside Wisconsin and ship interstate into Wisconsin.

25.    The challenged restraint operates directly on the flow of interstate equipment supply into the Wisconsin market and on the access of Wisconsin retail venues to interstate equipment supply.

26.     Plaintiff's sweepstakes platforms operate over interstate internet networks.

27.     This Court has personal jurisdiction over each Defendant. WAMO has its principal place of business in Madison, Wisconsin. P&P has its principal place of business in Brookfield, Wisconsin. Weigel is, on information and belief, a Wisconsin resident. Each Defendant is at home in Wisconsin and, separately, engaged in the challenged conduct throughout Wisconsin.

28.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including conduct directed at and affecting WAMO's principal place of business in Madison, Wisconsin and the operation of the closed-loop structure in this District.

29.     Venue is also proper under 15 U.S.C. § 22 (Clayton Act venue) because, on information and belief, each corporate Defendant is found in and transacts business in this District.

## FACTUAL ALLEGATIONS

### A.   The Wisconsin Amusement-Machine Market and the LuckLake Platform

30.     The relevant product market is the market for the supply, placement, and operation of skill-game and sweepstakes amusement machines in licensed retail venues in the State of Wisconsin (the "Relevant Market").

31.     The relevant geographic market is the State of Wisconsin.

32.     The Relevant Market has historically been dominated by route operators who place legacy equipment — darts, pool tables, jukeboxes, and skill-game machines — in bars, restaurants, and other retail venues under revenue-sharing agreements.

33.     On information and belief, the dominant manufacturer of skill-game machines supplied into the Relevant Market is Banilla Games, Inc. ("Banilla"), a North Carolina corporation. Banilla is not a party to this action.

34.     RAD Software was founded in 2023.

35.     RAD Software develops and operates an innovative platform that combines online sweepstakes casino sites — including LuckLake, RadPoker, and Lucky Canoe — with physical sweepstakes machines placed in licensed retail venues.

36.     The LuckLake platform represents a new technological category of amusement-machine offering that competes with legacy skill-game equipment.

37.     Although RAD Software has been marketing the LuckLake platform to Wisconsin retail venues, including through a partnership with the Wisconsin Restaurant Association ("WRA") member-benefit revenue-share program — using a direct distribution channel that does not require participation by WAMO operator-members, its exclusion from WAMO has harmed RAD Software's ability to purchase additional skill-game machines as well as its ability to compete in the Relevant Market.

**B.   WAMO Is Structurally a Combination Among Horizontal Competitors**

38.     According to documentation available on its website, WAMO's Bylaws were last amended on June 13, 2018 (the "Bylaws"). At true and correct copy of WAMO's bylaws are

attached hereto as Exhibit A. As of the date of filing, the Bylaws were publicly available at https://wamo.net/become-member/ (last visited May 14, 2026).

39.     The Bylaws establish a closed-loop membership structure that confers admission control on a board of horizontal competitors and renders structurally ineligible for membership any new entrant that does not maintain a legacy route in the equipment categories WAMO's incumbent operator-members supply.

40.     Article II, Section 1(a) of the Bylaws defines Operator Members as "those persons, firms or corporations which engage in the business of operating amusement, music, recreational and allied vending machines and who maintain ownership of and provide those machines on a revenue-sharing or lease basis to second-party businesses."

41.     The membership definition therefore inscribes the revenue-share placement model — the same model that yields the supracompetitive royalty described in Section E below — into the structural identity of the association.

42.     Article II, Section 1(a) further restricts voting Operator Members to entities operating no fewer than fifty (50) machines, including a minimum of five (5) darts, five (5) pool tables, and five (5) jukeboxes, in not less than ten (10) different locations.

43.     The composition requirement is not technology-neutral: an applicant must already operate the very equipment categories incumbent members supply before it may be admitted.

44.     Article II, Section 1(a) also categorically excludes from operator-member status the downstream customer constituency for WAMO operator-members' services.

45.     The Bylaws provide: "WAMO will not accept as operator members any persons or businesses who primarily operate retail locations such as taverns, bowling alleys, family entertainment centers or other similar on-premise business locations. (Such persons or businesses should instead engage the services of an amusement route operator who is a WAMO operator member.) Such persons or businesses, if they nonetheless obtained WAMO operator-member status, are subject to membership revocation and/or suspension."

46.     Article II, Section 1(a) additionally provides that an operator member "shall not engage in the sale of machines or equipment, directly or indirectly, to any second party business."

47.     Read together, these provisions of Article II, Section 1(a) define WAMO as the trade association of revenue-share-placing intermediaries and formally exclude from membership both (i) the downstream venue customers of WAMO operator-members, (ii) any operator who would sell rather than place equipment, (iii) any operator who presently operates less than 50 machines, and does not operate specific denominations of darts, pool tables, and jukeboxes.

48.     Yet for a broad swath of machines - specifically, Banilla Games, WAMO is a prerequisite for eligibility to purchase those machines inside Wisconsin. Consequently, Parties such as Plaintiff who may wish to purchase 50 machines from Banilla and thereby work toward satisfying some of the terms in an effort to qualify themselves as potential members of WAMO, membership is forever barred by the close loop system described below in Section C.

49.     Plaintiff does not presently qualify for WAMO membership and one of the principal avenues for qualifying itself for membership is deliberately blocked by the structural limitations on the market imposed by WAMO itself.

50.     The provisions are not constituency-neutral: they single out the precise category of market participants — retail venue operators — whose direct ownership and operation of equipment, or whose direct purchase of equipment from an operator member, would eliminate the revenue-share intermediary role on which WAMO operator-members depend.

51.     The parenthetical instructional clause — directing excluded venue operators to "instead engage the services of an amusement route operator who is a WAMO operator member" — states the substitution the Bylaws are designed to compel.

52.     The categorical exclusion of downstream customers such as venue owners from WAMO is specifically designed to block them from enjoying the economic benefits of vertical integration because this would allow venue owners to "cut out the middleman" and improve their own profit margins at the expense of WAMO and its members.

53.     No procompetitive trade-association function plausibly explains the exclusion of the downstream customer constituency from membership or the prohibition on operator-member equipment sales. A trade association may legitimately define its membership by reference to the trade or profession of its members; it has no legitimate trade association reason to formally bar the customers of its members from joining or to formally prohibit its members from selling rather than placing and leasing equipment.

54.     Article II, Section 2 of the Bylaws requires that every applicant "receive the recommendation of not less than two (2) operator members in good standing for at least two years, who are personally acquainted with the applicant."

55.     This recommendation requirement effectively grants every existing operator-member a personal blackball over admission of any prospective competitor.

56.     Article II, Section 2 of the Bylaws further provides that "[a]pproval of applications for membership is at the absolute discretion of the Board of Directors."

57.     There are no objective, published, or judicially reviewable standards constraining that discretion.

58.     Article II, Section 4(b) of the Bylaws provides that any new member is "probationary for the first five years of membership and . . . may be revoked by the Board of Directors without cause."

59.     Article III, Section 2(b) of the Bylaws requires that ten (10) of the eleven (11) directors be operator-members or their representatives — that is, horizontal competitors in the Relevant Market who would be affected by, and benefit from, the exclusion of new entrants. Only one (1) director may be a non-operator "trade member."

60.     WAMO's Board of Directors and Membership Committee — the bodies that admit or exclude prospective members — are themselves a combination of horizontal competitors who collectively decide who else may participate in the Relevant Market on the supply side.

61.     The membership architecture established by the Bylaws performs two distinct exclusionary functions in tandem. First, it places admission decisions in the hands of a Board of Directors and Membership Committee composed of horizontal competitors who collectively decide who else may participate in the Relevant Market on the supply side. Second, it formally excludes the downstream customer constituency from membership and prohibits operator-members from selling equipment, thereby preventing the vertical integration of their customer bases that would dramatically reduce the revenue flowing to WAMO members pursuant to the revenue-share royalty scheme described in Section E below.

## C.   The Banilla / WAMO-Membership Equipment-Supply Restriction

62.     On information and belief as further demonstrated on the websites of its distributors, Banilla has entered into agreements with its authorized Wisconsin distributors restricting all Wisconsin sales of Banilla equipment to current members of WAMO.

63.     Authorized Banilla distributors publicly confirm this restriction.

64.     For example, various Banilla games resellers list nearly identical disclaimers on their websites pertaining to the prohibition of sales to non-WAMO parties in Wisconsin. These include 8 Line Supply (Exhibit B), Great Lakes Amusement (Exhibit C), PB&J Industries (Exhibit D) and Reel Amusements (Exhibit E). Attached as Exhibits B – E to this Complaint are true and correct screenshots from the websites of 8 Line Supply (Exhibit B), Great Lakes Amusement (Exhibit C), PB&J Industries (Exhibit D) and Reel Amusements (Exhibit E).

65.     In each and every instance, the distributors make a disclosure that sales in Wisconsin are limited to current members of the Wisconsin Amusement and Music Operators

and oftentimes they go on further, to state that membership in WAMO will be verified prior to shipping equipment into Wisconsin.

66. Great Lakes Amusements publicly discloses that the prohibition flows from an agreement directly with Banilla Games, "[p]ursuant to an agreement between Great Lakes Amusement and Banilla Games, sale of this product in the State of Wisconsin is limited to current members of the Wisconsin Amusement Machine Operators Association (WAMO). Before shipment to Wisconsin, we will verify membership in WAMO." (Exhibit C.)

67. PB&J Industries, Inc. publishes on its product pages: "Pursuant to an agreement between PB&J Industries, Inc. and Banilla Games, sale of Banilla Games products in the State of Wisconsin is limited to current members of the Wisconsin Amusement & Music Operators Association (WAMO)." (Exhibit D.)

68. 8 Line Supply publishes: "Pursuant to an agreement between 8 Line Supply and Banilla Games, the sale of this product in the State of Wisconsin is limited to current members of the Wisconsin Amusement & Music Operators, Inc. (WAMO), and they will verify membership in WAMO before shipment to Wisconsin." (Exhibit B.)

69. On information and belief, Banilla does not maintain a comparable distribution restriction in any other state in which it sells skill-game equipment.

70. The Wisconsin-only character of the restriction is not explained by any independent commercial rationale of Banilla's own, and is, on information and belief, a response to the market conditions in Wisconsin created by WAMO's closed-loop structure described in Section B above.

71.     WAMO knows of, orchestrates, actively facilitates, and benefits from the Banilla restriction.

72.     WAMO's Board of Directors, Membership Committee, and President are aware that WAMO membership is the gatekeeping credential for access to Banilla equipment in Wisconsin.

73.     WAMO's membership records and verification responses to Banilla distributors are an essential, indispensable component of the operation of the restriction: without WAMO's active cooperation in confirming applicant membership, the restriction could not function.

74.     WAMO has not disavowed the Banilla restriction, has not sought to terminate the verification arrangement with Banilla distributors, and has not taken any step to make Banilla supply available to non-WAMO Wisconsin purchasers.

75.     On information and belief, WAMO and its operator-members affirmatively procured, demanded, or sustained Banilla's adherence to the Wisconsin distribution restriction by reason of WAMO's control over approximately ninety-five percent (95%) of amusement-machine and skill-game placements in Wisconsin retail venues, which gave Banilla no realistic commercial alternative to participation in the closed-loop arrangement if Banilla wished to access the Wisconsin market at all.

**D.   The Closed-Loop Effect: Market Power and Exclusion**

76.     On information and belief, Banilla equipment accounts for approximately eighty percent (80%) of skill-game machines supplied to Wisconsin route operators.

77.     On information and belief, Banilla equipment has no substitutable equivalent for Wisconsin operators in performance, software ecosystem, or supply availability.

78.     On information and belief, WAMO operator-members collectively account for approximately ninety-five percent (95%) of all amusement-machine and skill-game placements in Wisconsin retail venues.

79.     The combined operation of (i) WAMO's horizontally controlled membership structure and (ii) WAMO's knowing participation in the Banilla / WAMO-membership verification mechanism confers on WAMO and its operator-members market power sufficient to exclude competition from non-WAMO entrants in the Relevant Market.

### E.   Supracompetitive Pricing in the Closed-Loop Market

80.     The closed-loop structure described in Sections B through D above has produced a directly observable market distortion in the form of supracompetitive pricing extracted from Wisconsin retail venues.

81.     WAMO operator-members — including Defendant P&P — place skill-game and other amusement-machine equipment in Wisconsin bars, restaurants, and other licensed retail venues under revenue-sharing agreements pursuant to which the route operator collects a recurring share of the gross revenue generated by each placed machine for the life of the placement.

82.     On information and belief, WAMO operator-members in Wisconsin charge Wisconsin retail venues a revenue-share royalty of approximately fifty percent (50%) of the

gross revenue generated by each placed machine, for the life of the placement, in exchange for sourcing, installing, and nominally maintaining the equipment.

83.     On information and belief, the actual maintenance service provided is intermittent and substandard.

84.     On information and belief, in jurisdictions that permit comparable amusement-machine and skill-game placements and that are not subject to a trade-association-controlled distribution chain analogous to the WAMO closed-loop structure, the route-operator revenue-share royalty is materially lower.

85.     On information and belief, in Texas, where no trade-association combination inserts itself in the equipment-supply chain in the manner alleged here, the route-operator share of placement revenue ranges from approximately fifteen percent (15%) to approximately twenty-five percent (25%).

86.     By way of a comparative example, on information and belief, Slot Amusements LLC, a route operator in Texas, collects an approximate average of fifteen to twenty percent of a venue's gross revenue from the amusement machines.

87.     The Wisconsin royalty is therefore approximately between two and more than three times higher than the comparable royalty in competitively structured markets.

88.     On information and belief, the Wisconsin premium is not explained by superior service, by superior equipment, by greater installation cost, or by any other procompetitive efficiency.

89.     On information and belief, the Wisconsin premium is a direct consequence of the WAMO closed-loop structure: because non-WAMO entrants cannot access the dominant skill-game equipment supply, and because Article II, Section 1(a) of the Bylaws categorically excludes Wisconsin retail venues from operator-member status and prohibits operator-members from selling equipment to them, Wisconsin retail venues have no competitive alternative source for top-quality equipment, and incumbent WAMO operator-members are accordingly able to extract a supracompetitive royalty from Wisconsin retail venues that route operators in competitively structured markets cannot.

90.     Wisconsin retail venues bear the economic burden of the supracompetitive royalty.

91.     Wisconsin retail venues accept the fifty-percent (50%) revenue-share because the closed-loop structure leaves them no competitively available alternative source of top-quality skill-game equipment.

### F.   Plaintiff and Other Excluded Entrants

92.     Plaintiff is a non-route, technology-platform entrant offering sweepstakes machines through direct venue distribution.

93.     Plaintiff does not maintain — and as a sweepstakes-platform business would not in the ordinary course maintain — a legacy darts/pool/jukebox route satisfying Article II, Section 1(a)'s composition requirement.

94.     Plaintiff is therefore structurally ineligible for WAMO membership, regardless of merit.

95. Plaintiff is foreclosed by operation of the Banilla restriction from purchasing the dominant skill-game equipment in the Relevant Market.

96. On information and belief, additional prospective entrants have been similarly foreclosed or deterred from competing in the Relevant Market by the same closed-loop structure.

97. By way of representative example, Alchemy Amusements and its principal Jason Boesel, as well as MKE Amusements, owned by Chris Trudeau, have been foreclosed or deterred, in part or in whole, from entering and thriving in the Wisconsin amusement machine market as a direct result of WAMO's closed-loop structure.

### G. Harm to Competition

98. The closed-loop structure causes harm to competition in the Relevant Market, distinct from and in addition to the harm to Plaintiff as an individual competitor.

99. The closed-loop structure forecloses non-WAMO entrants from purchasing the dominant skill-game equipment in Wisconsin, including but not limited to Plaintiff.

100. The closed-loop structure suppresses adoption of innovative platforms (including sweepstakes-based platforms like Plaintiff's) in favor of legacy equipment supplied by incumbent operator-members.

101. The closed-loop structure restricts the choice available to Wisconsin retail venue operators among competing platforms.

102. The closed-loop structure entrenches incumbent WAMO operator-members' market positions through structural exclusion rather than competition on the merits.

103. The closed-loop structure enables incumbent WAMO operator-members to extract supracompetitive royalties from Wisconsin retail venues, which Wisconsin retail venues accept because the closed-loop structure leaves them no competitively available alternative source of top-quality equipment.

104. The closed-loop structure imposes the supracompetitive royalty cost on Wisconsin retail venues — downstream market participants who lack any competitive alternative source of supply — and thereby harms a non-party constituency of Wisconsin consumers and businesses, in addition to the direct harm imposed on excluded competitors such as Plaintiff.

105. The closed-loop structure has the structural characteristics of a classic group boycott: a group of horizontal competitors at one level of the market (route operators) has combined to deprive would-be competitors at the same level of a trade relationship those competitors need in order to enter or thrive in the market (i.e., access to the dominant equipment supply), by inducing the dominant supplier to refuse to deal with non-group members.

### H.   Defendant Weigel's Overt Acts in Furtherance of the Combination

106. Defendant Weigel simultaneously serves as the President of WAMO and as the principal of P&P, an incumbent WAMO operator-member that competes directly with Plaintiff for venue placements.

107. Weigel has a direct, personal economic interest in maintaining the closed-loop exclusion of Plaintiff and other innovative entrants.

108. When Plaintiff began acquiring Wisconsin venue customers through the WRA partnership, Weigel responded by using his WAMO presidency and his industry standing to

disparage Plaintiff to prospective customers, in furtherance of the broader scheme to exclude non-WAMO entrants.

109.    On information and belief, additional similar disparagement has occurred.

**I.    The March 9, 2026 Meeting**

110.    On or about March 9, 2026, Plaintiff's founder and principal, Raymour Radhakrishnan, met in person with Weigel at Plaintiff's Milwaukee showroom.

111.    Weigel attended in his capacity as President of WAMO and as the owner of P&P.

112.    Other Wisconsin route operators were present at the meeting.

113.    During the meeting, Plaintiff presented the LuckLake platform and discussed its general economic terms.

**J.    The March 17, 2026 Communication**

114.    On March 16, 2026, the owner of Curly's Waterfront Sports Bar ("Curly's"), a prospective customer of Plaintiff introduced through the WRA member-benefit program, asked Weigel for his view of Plaintiff's platform.

115.    On March 17, 2026 at approximately 9:42 a.m. CDT, Weigel, using his P&P email account mike@wisconsinpandp.com (the "March 17 Email"), responded to Curly's.

116.    In the March 17 Email, Weigel represented to Curly's that LuckLake machines perform less profitably than competing equipment manufactured by Banilla and by Big Daddy (the "March 17 Communication").

117.    The March 17 Communication is materially false.

118.    On information and belief, based on industry-observed performance data and information obtained from current and former WAMO operator-members, LuckLake machines outperform comparable Banilla and Big Daddy equipment by at least approximately twenty percent (20%) on a per-machine net-profit basis in comparable Wisconsin retail venues.

119.    Weigel knew, or recklessly disregarded the truth of, the falsity of the March 17 Communication.

120.    As a sophisticated route operator who places competing skill-game equipment in comparable Wisconsin retail venues, as the principal of P&P, and as the President of WAMO — the apex of the gatekeeping institution at the center of the closed-loop structure described above — Weigel had access to and was familiar with industry-observed performance data, and knew or recklessly disregarded that LuckLake machines materially outperform Banilla and Big Daddy equipment in the Relevant Market.

121.    On information and belief, Weigel made the March 17 Communication to advance WAMO's anticompetitive program of excluding non-WAMO entrants and to protect the supracompetitive pricing and market position of incumbent WAMO operator-members, including P&P.

122.    Weigel published the March 17 Communication in his commercial capacity as the principal of P&P, in response to a sales-related inquiry from a prospective customer of P&P, regarding a directly competing product, for the purpose of influencing that customer's purchasing decision.

123. On information and belief, the communication was part of an organized campaign to disparage non-WAMO entrants and was disseminated to a relevant portion of the prospective-customer community in the Relevant Market.

124. Weigel knew or should have known that the communication would be — and in fact was — forwarded and republished among Wisconsin retail venue operators, as is customary in the close-knit Wisconsin coin-operated amusement industry.

125. The March 17 Email is representative of Defendants' broader pattern of disparagement directed at non-WAMO entrants, including Plaintiff, as part of the anticompetitive scheme described herein.

### K. Republication

126. Following its initial transmission to Curly's, the March 17 Email was forwarded by recipients to additional prospective customers and industry participants in the Wisconsin retail-venue and amusement-operator communities.

127. Weigel knew or reasonably foresaw that the March 17 Email would be forwarded to other prospective customers and industry participants.

128. On information and belief, the March 17 Communication has been further republished within the Wisconsin coin-op operator and hospitality communities.

### L. P&P's Liability

129. At all material times, Weigel was acting within the scope of his employment and authority as the principal of P&P when he sent the March 17 Email — using a P&P email

account, regarding a competitor of P&P, in furtherance of P&P's commercial interests in the Wisconsin amusement-machine market.

### M.   Damages

130.    As a direct and proximate result of the closed-loop structure and Defendants' conduct in furtherance of it, Plaintiff has suffered antitrust injury and actual damages, including: foreclosure from purchasing the dominant skill-game equipment in Wisconsin and consequent loss of sales and profits in the Relevant Market; lost prospective business with Curly's Waterfront Sports Bar and other Wisconsin retail venues; and the impairment of Plaintiff's ability to compete on the merits in the Relevant Market.

131.    Plaintiff has also suffered injury to the commercial reputation of the LuckLake platform actionable under the Lanham Act.

132.    Absent injunctive relief, Plaintiff will continue to be foreclosed from purchasing the dominant skill-game equipment in the Relevant Market, will continue to be barred by structural ineligibility from membership in the gatekeeping institution that controls supply, and will continue to suffer ongoing competitive injury each time it attempts to acquire, retain, or expand venue customers in Wisconsin.

133.    The injury to Plaintiff is ongoing, recurring, and prospective, and will continue until the closed-loop structure is dissolved by order of this Court.

**FIRST CAUSE OF ACTION**
**(Unreasonable Restraint of Interstate Trade – Sherman Act § 1, 15 U.S.C. § 1)**
*(Against All Defendants)*

134. Plaintiff RAD Software restates and incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

135. Section 1 of the Sherman Act, 15 U.S.C. § 1, declares unlawful every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.

136. WAMO is a combination within the meaning of Section 1 of the Sherman Act. Its Board of Directors and Membership Committee — the bodies that admit or exclude prospective competitors in the Relevant Market — are themselves composed of horizontal competitors. The decisions those bodies make about admission and continued membership are, in substance and effect, agreements among competitors about who else may participate in the Relevant Market on the supply side.

137. Defendant P&P is a knowing participant in and beneficiary of the WAMO combination, in its capacity as a WAMO operator-member that competes directly with Plaintiff in the Relevant Market.

138. Defendant Weigel is a knowing participant in and beneficiary of the WAMO combination, in his capacities as a WAMO board member, the President of WAMO, the principal of P&P, and the author of overt acts in furtherance of the combination, including the March 17 Communication described above.

139. The combination has, in operation and effect, restrained interstate trade in the Relevant Market.

140.   WAMO's knowing participation in the Banilla / WAMO-membership verification mechanism — through which WAMO's membership records function as the gatekeeping credential for access to the dominant interstate skill-game equipment supply — converts WAMO's private admission decisions into market-exclusion decisions.

141.   The result is a concerted refusal to deal that forecloses non-WAMO entrants — including Plaintiff — from access to the dominant skill-game equipment supply, equipment that is shipped interstate from North Carolina and from other out-of-state distributors into Wisconsin.

142.   The combination has the structural and operational characteristics of a classic group boycott prohibited by Section 1 of the Sherman Act: a group of horizontal competitors at the route-operator level has combined to barricade itself from competition at that level by inducing the dominant equipment manufacturer and its distributors to deny to non-WAMO entrants the trade relationship those entrants need in order to enter the Relevant Market.

143.   Defendants possess substantial market power in the Relevant Market. On information and belief, Banilla supplies approximately eighty percent (80%) of skill-game machines to Wisconsin route operators, with no substitutable equivalent. WAMO operator-members collectively account for approximately ninety-five percent (95%) of amusement-machine and skill-game placements in Wisconsin retail venues.

144.   The exercise of that market power is reflected in the supracompetitive revenue-share royalty extracted from Wisconsin retail venues.

145.   The combination of WAMO's horizontal admission structure, its knowing participation in the Banilla verification mechanism, and the supracompetitive royalty regime is

sufficient to exclude competition and to harm both excluded competitors and downstream Wisconsin retail venues.

146.    The restraint is unreasonable.

147.    The membership architecture established by Article II, Section 1(a) of the Bylaws lacks any plausible procompetitive justification. Article II, Section 1(a) not only conditions admission on the maintenance of legacy darts, pool, jukebox and recreational (skill based) routes but also categorically excludes from membership the downstream customer constituency (retail venue operators) and categorically prohibits operator-members from selling equipment to them. No legitimate trade-association purpose is served by either of those latter two provisions; their function is to foreclose downstream vertical integration and to channel equipment placement exclusively through the revenue-share model that defines WAMO operator-member status.

148.    The restraint eliminates non-WAMO entrants from access to the dominant equipment supply, restricts technological innovation, denies retail venues meaningful platform choice, reduces output, and sustains the supracompetitive royalty regime.

149.    WAMO's legitimate trade-association functions — industry training, legislative advocacy, member services — can be served without WAMO's participation in any third-party equipment-supply restriction conditioned on WAMO membership and without the venue-exclusion and sales-prohibition provisions of Article II, Section 1(a).

150.    Plaintiff has suffered antitrust injury — injury of the type the antitrust laws were intended to prevent and that flows from harm to competition itself.

151.    Plaintiff is foreclosed from purchasing the dominant skill-game equipment in the Relevant Market, has lost identifiable prospective business, and is not the only competitor injured by the closed-loop structure.

152.    Plaintiff is a direct target and direct victim of the restraint, suffers concrete economic injury, and seeks remedies that operate directly on the named Defendants' own conduct.

153.    Absent injunctive relief, Plaintiff will continue to be foreclosed from purchasing the dominant skill-game equipment in the Relevant Market, will continue to be barred by structural ineligibility from membership in the gatekeeping institution that controls supply, and will continue to suffer ongoing competitive injury each time it attempts to acquire, retain, or expand venue customers in Wisconsin.

154.    Plaintiff is entitled to comprehensive injunctive and structural relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, including an order:

(i)    enjoining WAMO from participating in, facilitating, or enforcing any third- party equipment-supply restriction conditioned on WAMO membership in Wisconsin, including the Banilla / WAMO-membership verification mechanism;

(ii)    enjoining WAMO from verifying, confirming, denying, or otherwise responding to any inquiry from an equipment manufacturer or distributor regarding the WAMO-membership status of any actual or prospective Wisconsin purchaser, except as required by law;

(iii)    requiring WAMO to issue and publish written notice to Banilla Games, Inc. and each of its authorized distributors that WAMO does not endorse, request, support, or

participate in any restriction on the sale of equipment in Wisconsin conditioned on WAMO membership;

(iv)     enjoining WAMO and its operator-member directors from collectively conditioning admission, continued membership, or governance privileges within WAMO on an applicant's operation of any particular legacy equipment category, and from otherwise maintaining or enforcing the Bylaw provisions described in Section B of the Factual Allegations above to the extent those provisions are deployed as instruments of exclusion from the Relevant Market; and

(v)     such further prophylactic relief as the Court determines is necessary to prevent the re-formation of the closed-loop structure or the substitution of a functionally equivalent restraint.

155.    Plaintiff is additionally entitled to recover threefold the damages sustained, together with the cost of suit and reasonable attorneys' fees, under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## SECOND CAUSE OF ACTION
**(Unreasonable Restraint of Trade (in the alternative) – Wis. Stat. § 133.03(1))**
*(Against All Defendants)*

156.    Plaintiff RAD Software restates and incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

157.    Wis. Stat. § 133.03(1) declares unlawful every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce.

158.    For each of the reasons set forth in the First Cause of Action, WAMO's closed-loop structure and Defendants' participation in it constitute an unreasonable restraint of trade in violation of Wis. Stat. § 133.03(1).

159.    To the extent the conduct alleged has effects on intrastate Wisconsin trade independent of its interstate effects, those intrastate effects are substantial and independently actionable under Wis. Stat. § 133.03(1).

160.    Plaintiff is entitled to recover treble damages, the cost of suit, and reasonable attorneys' fees under Wis. Stat. § 133.18, and to injunctive relief under Wis. Stat. § 133.16, on terms equivalent to those requested in the First Cause of Action.

### THIRD CAUSE OF ACTION
### (False Commercial Promotion – Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B))
*(Against Defendants Weigel and P&P)*

161.    Plaintiff RAD Software restates and incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

162.    Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), prohibits any person from using in commercial advertising or promotion any false or misleading description of fact, or false or misleading representation of fact, which misrepresents the nature, characteristics, or qualities of another person's goods, services, or commercial activities.

163.    The March 17 Communication is a false statement of fact about the nature, characteristics, and qualities of Plaintiff's LuckLake platform.

164.   The March 17 Communication falsely represents that the per-machine performance of the LuckLake platform is inferior to that of competing Banilla and Big Daddy equipment.

165.   On information and belief, the actual per-machine net profit of the LuckLake platform materially exceeds that of comparable Banilla and Big Daddy equipment in comparable Wisconsin retail venues.

166.   Weigel published the March 17 Communication in commercial advertising or promotion.

167.   Weigel published the March 17 Communication in his commercial capacity as the principal of P&P; in response to a sales-related inquiry from a prospective customer of P&P; regarding a directly competing product (the LuckLake platform); for the purpose of influencing the prospective customer's purchasing decision.

168.   On information and belief, Weigel's publication of the March 17 Communication was part of an organized campaign to disparage non-WAMO entrants and to protect incumbent operator-members' market positions.

169.   The communication was reasonably likely to reach — and in fact did reach — a substantial portion of the relevant prospective-customer community in the Relevant Market through foreseeable republication.

170.   On information and belief, Weigel and P&P have made similar false or misleading representations to other prospective customers and industry participants.

171.    The false statement is material: it relates to per-machine economic performance, which is the central commercial criterion by which Wisconsin retail venues evaluate competing amusement-machine platforms.

172.    Weigel and P&P caused the March 17 Communication to enter interstate commerce. The March 17 Email was transmitted over interstate internet networks; was forwarded to additional recipients over interstate networks; concerned a product distributed over interstate internet networks; and operated to influence purchasing decisions in a market substantially affecting interstate commerce.

173.    Plaintiff has been and is likely to continue to be injured as a result of Defendants' false commercial promotion, including through diversion of prospective business and damage to the commercial reputation of the LuckLake platform.

174.    Plaintiff is entitled to recover damages, including any damages sustained and any profits earned by Defendants attributable to the violation, the costs of the action, and — in this exceptional case — reasonable attorneys' fees, under 15 U.S.C. § 1117(a).

175.    Plaintiff is also entitled to injunctive relief under 15 U.S.C. § 1116.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff RAD Software respectfully requests that this Court enter judgment in its favor and against Defendants, and grant the following relief:

A.    On the First Cause of Action (Sherman Act § 1), as principal relief, structural and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, ordering:

(i)    that Defendant WAMO be enjoined from participating in, facilitating, or enforcing any third-party equipment-supply restriction conditioned on WAMO membership in Wisconsin, including the Banilla / WAMO-membership verification mechanism;

(ii)    that Defendant WAMO be enjoined from verifying, confirming, denying, or otherwise responding to any inquiry from an equipment manufacturer or distributor regarding the WAMO-membership status of any actual or prospective Wisconsin purchaser, except as required by law;

(iii)    that Defendant WAMO be required to issue and publish written notice to Banilla Games, Inc. and each of its authorized distributors that WAMO does not endorse, request, support, or participate in any restriction on the sale of equipment in Wisconsin conditioned on WAMO membership;

(iv)    that Defendants WAMO, P&P, and Weigel, and each operator-member director acting in concert with them, be enjoined from collectively conditioning admission, continued membership, or governance privileges within WAMO on an applicant's operation of any particular legacy equipment category, and from otherwise maintaining or enforcing the Bylaw provisions described in Section B of the Factual Allegations above to the extent those provisions are deployed as instruments of exclusion from the Relevant Market; and

(v)    such further prophylactic and structural relief as the Court determines is necessary to prevent the re-formation of the closed-loop structure or the

substitution of a functionally equivalent restraint; and, as secondary relief, treble damages, the cost of suit, and reasonable attorneys' fees under 15 U.S.C. § 15;

**B.**     On the Second Cause of Action (Wis. Stat. § 133.03(1)), in the alternative: injunctive and structural relief under Wis. Stat. § 133.16 on terms equivalent to those requested in Paragraph A above, and treble damages, the cost of suit, and reasonable attorneys' fees under Wis. Stat. § 133.18;

**C.**     On the Third Cause of Action (Lanham Act § 43(a)(1)(B)): damages, including any damages sustained by Plaintiff and attributable to the violation; the costs of the action; reasonable attorneys' fees in this exceptional case; and injunctive relief, all under 15 U.S.C. §§ 1116 and 1117(a);

**D.**     Injunctive relief under 15 U.S.C. § 1116 restraining Defendants Weigel and P&P from publishing further false or misleading statements of fact concerning Plaintiff or the LuckLake platform in commercial advertising or promotion;

**E.**     Pre- and post-judgment interest, costs, and disbursements; and

**F.**     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: May 18, 2026.

Respectfully submitted,

LITWIN KACH LLP

_/s/ Carlos E. Duque_ _____
Carlos E. Duque,
401 N. Michigan Ave., Ste. 1200
Chicago, IL 60611
(317) 270-3353
*carlos@litwinkach.com*

Albert Bianchi, Jr.
MICHAEL BEST & FRIEDRICH LLP
One South Pinckney Street, Suite 700
Madison, WI 53703
Telephone: 608.257.3501
Facsimile: 608.283.2275
aj.bianchi@michaelbest.com

*Attorneys for Plaintiff RAD Software LLC*